[No. 29519. Department One. April 19, 1945.]

GEORGE WELLINGTON STODDARD, *Appellant,* v. KING COUNTY, *Respondent.*[1]

[1]Reported in 158 P. (2d) 78.

*Riddell & Riddell,* for appellant.

*Lloyd Shorett* and *Wm. R. Bell,* for respondent.

JEFFERS, J.—This is an appeal by George Wellington Stoddard, plaintiff, from a judgment made and entered by the superior court of King county on July 25, 1944, dismissing with prejudice an action against King county. As shown by the complaint, plaintiff sought to obtain a judgment in the sum of $6,837 for services performed by him under a contract with King county. The services which he claimed to have performed consisted of preparing preliminary plans and specifications necessary to make application for Federal assistance in building and equipping a two-hundred-bed addition to Harborview hospital in Seattle.

Further allegations of the complaint are to the effect that a Federal grant was obtained in the sum of six hundred thousand dollars, but that, because of King county's failure, without justification, to raise the sum of two hundred thousand dollars provided for in the grant as the sponsor's share, the Federal grant was rescinded; that the plaintiff presented to the board of commissioners of King county his claim, in

the amount hereinabove stated, for services performed, and that such claim was rejected by the board.

The answer of King county denies the material allegations of the complaint and specifically denies that plaintiff ever had a valid contract with King county under which he would be entitled to recover; and denies any and all liability for any services that may have been performed by plaintiff. Where necessary, the specific allegations of the complaint will hereinafter be referred to. The facts are not so much in dispute in this case, but the conclusions to be drawn therefrom present the difficulties here.

Plaintiff is an architect, residing in Seattle. In 1941, the hospital situation in Seattle became so acute as to present a problem because of the apparent inability of the hospitals to accommodate those desiring hospitalization. On June 16, 1941, the board of county commissioners of King county, hereinafter referred to as the "board," received a communication from the board of trustees of the Harborview hospital regarding the overcrowded condition existing therein, pointing out that, in case of a service emergency, the hospital would not have space or equipment sufficient to care for the additional patients, and recommending that the board take steps to provide for such an emergency.

Apparently acting on that suggestion, the board, on motion, referred the matter to its chairman, Tom Smith, for his consideration and attention. Although the resolution contained no specific authority to take any final action, it was the *only* authority given Mr. Smith prior to February 26, 1942, and, apparently, was the basis for his subsequent acts, at least up until May 29, 1942.

While paragraph five of the complaint alleges that, in the month of February, 1942, the board passed a resolution which was not recorded in the minutes of the meeting, *for the employment of the plaintiff as an architect in the preparation of plans and specifications for the work,* Mrs. Minnie Smith, clerk of the board, and Russell H. Fluent and Archie E. Phelps, the other two members of the board, all testified that no such resolution was ever presented or passed.

It appears from the testimony of Mr. Smith that, after the

resolution of June 16, 1941, was passed, he contacted a Mr. Taylor in regard to the preparation of the preliminary plans and specifications necessary to enable King county to make application for a Federal grant. Mr. Taylor, for some reason, did not give the matter his attention, and it dragged along until about the time of Pearl Harbor. During that time, considerable publicity was given to the proposed project, and, in July or August, 1941, Mr. Smith was contacted by R. L. Stoddard, brother of appellant, who is connected with plaintiff's business in some way. Mr. Stoddard inquired as to whether or not there was a possibility of plaintiff's firm securing the architectural work on the proposed project.

Nothing further was done, in so far as plaintiff was concerned, until February 26, 1942, when Mr. Smith wrote to plaintiff the following letter on the stationery of the board (omitting formal parts):

"Dear Mr. Stoddard:

"By action of the Board of County Commissioners of King County, you are hereby authorized to prepare all of the necessary preliminary plans, specifications, estimates and in conjunction with my office, to file the necessary application for Federal Funds with the Defense Public Works for a 200 room addition to Harborview Hospital.

"It is hereby understood that you are retained on a contingency basis to do this work. In the event a Federal grant is made by Defense Public Works or any other Federal agency, for this job, we will enter into a contract with you as our Architect for this project to prepare complete plans and specifications and to attend to all supervision and other architectural duties on a regular 6% Fee basis.

"In the event no Federal Grant is made available for this job and the job does not materialize, the Board of King County Commissioners is in no way obligated to your firm." The letter was signed, "Tom Smith, Chairman of the Board of County Commissioners."

The above-quoted letter is really the basis, and contains the terms, of plaintiff's claimed contract with the board. It is admitted that the letter was prepared jointly by R. L. Stoddard and Ken Griffin, Tom Smith's secretary, during Mr. Smith's absence, and signed and mailed by Mr. Griffin.

While Mr. Smith testified that he was contacted by telephone and had authorized the letter, he said had he written it he would have worded it differently; that the only authority he had had from the board was that contained in the resolution of June 16, 1941. Mr. Smith further testified that he did not discuss the terms of the letter with the other members of the board, although he thought he had told them that Mr. Taylor did nothing in the matter and he therefore had turned it over to Mr. Stoddard.

Archie E. Phelps testified that he never saw the letter of February 26, 1942, until he came into court, and Russell Fluent testified that he had not seen it until March, 1943, when he received a letter from R. L. Stoddard to the effect that such a letter had been written, whereupon Mr. Fluent requested Mrs. Smith to examine the files and a carbon copy of the letter was found.

After receipt of the letter of February 26, 1942, plaintiff proceeded to prepare the necessary plans and specifications for the application for a Federal grant, and, thereafter, acting in conjunction with Mr. Smith, such an application was filed. Prior to the filing of the application, there had been considerable correspondence between Mr. Smith and L. R. Durkee, regional engineer of the Federal works agency, in regard to the details of the application. There was also correspondence between plaintiff and Mr. Durkee, all of which was kept by Mr. Smith in his files.

On May 29, 1942, Mr. Smith, by letter addressed to the board, made a report of his activities in regard to the project, and, at that time, turned his files over to the clerk of the board to be made a part of the board's permanent files. Paragraph nine of the complaint alleges that, on May 29, 1942, Mr. Smith *orally reported to the board that he had employed the plaintiff as such architect pursuant to oral instructions from the board,* and then and there filed with the board his complete file of correspondence, which file included a copy of the letter from Mr. Smith to plaintiff, dated February 26, 1942, *whereupon by resolution the employment of plaintiff was ratified, confirmed, and approved.*

The letter containing Tom Smith's report, written to the board on May 29, 1942, is as follows (omitting formal parts):

"Gentlemen: Attached hereto is a complete file of correspondence, surveys, etc. relating to the application of King county for Federal funds for the construction of a 200-bed addition to Harborview Hospital.

"I am pleased to report at this time that the project is receiving very careful consideration from the Federal Government, and that the necessary naval and military endorsements for a project of this kind have been obtained. It is quite likely that approval of the project will be forthcoming in the very near future.

"In the preparation of this Application and its advancement to this point, I wish to acknowledge the close co-operation of Dr. Van Norman, the Board of Trustees of Harborview Hospital, the Regional office of the Federal Works Agency, and Mr. L. R. Durkee, the Regional Engineer in charge, and the firm of George Wellington Stoddard and Associates, architects and engineers, who have undertaken the preparation of preliminary plans and the preparation of the Application itself on a contingent basis.

"In the belief that the enclosed file should be a part of the permanent record of this Board, I am turning over to the Board at this time, all correspondence and other materials in my files."

After the above report was filed by Mr. Smith, and on May 29, 1942, the commissioners' records show the following resolution:

"Commissioner Smith submitted report and complete file of correspondence and survey regarding application of King County for Federal funds for construction of a 200-bed addition to Harborview Hospital, said report stating that the project is receiving careful consideration from the Federal government; that the necessary naval and military endorsements for such project have been obtained; that approval of the project is probable in the near future; and on motion report was approved and, at the request of Commissioner Smith, complete file made a part of the permanent Board file."

The foregoing is the resolution referred to in paragraph nine of the complaint, which, it is claimed, ratified, confirmed, and approved the employment of plaintiff.

Mr. Fluent's attention was directed to the allegations of paragraph nine, and he testified:

"Q. With respect to that, what is the truth about Tom Smith orally reporting to the Board at the date stated? A. He did report to the Board that he was working on the project. Q. But did he say anything about the employment of an architect? . . . A. He testified, and said at that time, that he had been consulting with Mr. Stoddard, and that he was willing to proceed on his own chances, take his own chances, and that the Board was in nowise liable for any of the things that he did of a preliminary nature. That was Tom Smith doing that. With that we filed his record."

Mr. Phelps was interrogated in regard to the letter of February 26, 1942, filed in connection with Mr. Smith's report of May 29, 1942, and stated that he never examined the report and never saw the letter of February 26, 1942, until he came into court. Mr. Phelps was asked the following questions:

"Q. Did you ever hear Tom Smith make any explanation of the connection of the Stoddard firm with this project? A. Yes. Q. What was it? A. Early in—I don't know what year it was in, he personally, he took up with me about having the architectural work or the application of an addition on the Harborview, and I opposed it at that time as I opposed it all the way through. Q. That is, you have always opposed the employment of the Stoddard firm? A. Yes, and my records will show it."

It appears from the evidence that the details of Mr. Smith's report were not, nor was any of the correspondence referred to therein, read or discussed in any detail at the time the report was made.

On October 21, 1942, the United States of America, through the Federal works agency, submitted to King county its written grant offer, subject to the terms and conditions specified therein, to make King county a grant of six hundred thousand dollars to aid in financing the acquisition and construction of an addition to Harborview hospital, estimated to cost eight hundred thousand dollars, contingent upon the contribution of King county of two

hundred thousand dollars as a sponsor's contribution to the project.

The above grant offer was not, however, an absolute grant, but, in addition to the contingency of sponsor's contribution of two hundred thousand dollars, was subject to other terms and conditions, among which was the right to terminate the grant offer

" . . . if the Applicant will not be able, in the opinion of the Government, or fails to provide when needed, or to demonstrate to the satisfaction of the Government that it can and will provide when needed, funds sufficient, with the funds made available by the Government under the Offer, to pay the cost of the public works described in the Offer."

On October 26, 1942, the board, by resolution, accepted the grant offer of the Federal government, subject to the terms and conditions thereof. On October 28, 1942, R. L. Stoddard presented a formal contract of employment to the board. Mr. Fluent and Mr. Phelps refused to sign the contract.

R. L. Stoddard, who, as hereinbefore stated, was the man handling the transaction for plaintiff, was asked the following questions:

"Q. Now, in answer to a number of questions propounded to you by counsel, you say Tom Smith told you to proceed? A. That's right. Q. Nobody else told you to proceed except Tom Smith? A. That's all. Q. And you were dealing always with Tom Smith? A. Assuming that he was Chairman of the Board of County Commissioners and authorized to handle this hospital situation. Q. And you always proceeded on Tom Smith's assurances? When he told you to go ahead you did it and . . . A. (interposing) That's right. Q. Never took any of these matters up with the Board in any form? A. I didn't think it was necessary."

On November 3, 1942, the commission caused to be placed on the election ballot the proposition of a one-mill levy to provide for the sponsor's share, or two hundred thousand dollars. The proposition did not receive the necessary number of votes, and lost.

We next come to the resolution of November 10, 1942, by virtue of which, it is alleged in paragraph twelve of the complaint, plaintiff was requested to furnish services to

King county in his capacity as an architect, which services he furnished. We quote the minutes of the November 10, 1942, meeting, as they were read into the record:

" 'Various communications from the Federal Works Administrator regarding procedure in connection with funds for addition to King county hospital together with forms, were on motion referred to the architect George W. Stoddard (delivered to Mr. Stoddard by Mr. Smith).

" 'On motion the clerk of the Board was directed to address a communication to G. W. Stoddard, architect for addition to King County Hospital, Joseph A. Whetstone, County Commissioner Elect of the North District, Governor Arthur B. Langlie, and L. R. Durkee, Regional Engineer, F. W. A., requesting them to attend a meeting with the Board of County Commissioners to be held in the office of the Board of King County Commissioners on Tuesday, November 17, 1942, at 10:30 A. M., for conference regarding the matter of examining all possibilities of providing Sponsor's contribution of $200,000 which is necessary if the $600,000 Federal grant is made available for hospital facilities in King County.' "

The minutes of the board, at the November 17, 1942, meeting, show the following entry:

" 'Communication was received from R. L. Stoddard, architect for addition to King County Hospital regarding engineering survey of the King County Hospital and requesting data in connection therewith, and on motion this matter was referred to the County Road Engineer for survey and report to be forwarded immediately to architect.' "

Mr. Fluent's attention was directed to the resolution of November 10, 1942, and he was asked what representation, if any was made to the board at that time, as to the Stoddard firm's relationship.

"A. It was the same representation as had been made previously. Q. Well, that doesn't mean anything. A. Explain it? Q. Go ahead. A. The same one as previously, that they were advising Mr. Smith on their own, taking their own chances that they possibly would receive the work, the architectural work. Q. And, as I understand it, that was the explanation that Tom Smith made to the Board at that time? A. He made that explanation several times. . . . I often inquired what the object was going ahead without the Board's consent, *and that was the explanation.*"

Mr. Fluent's attention was then called to paragraph thirteen of the complaint, in which it is alleged that, at a regular meeting of the board on November 17, 1942, by resolution appearing in the minutes, the board required additional services of plaintiff as such architect, which services were furnished, and to the resolution of November 17, 1942, hereinbefore set out. His explanation of the resolution last referred to was as follows:

"The Board never made one single move at any time toward consummation of a contract for an architect; and at that meeting that you cited that was called for November 17th, I positively stated that we were getting the cart before the horse; that the thing to do first was to obtain the $200,000.00 and then we would talk about an architect; and I expressed my disapproval of one member of the Board going ahead and selecting an architect at that time.

"I said I had no . . . absolutely no objection to who was chosen if that party was chosen by the Board in a regular manner. And I didn't care which firm was chosen either. But I did feel that I should have my one-third say on the matter. And as a result we didn't sign that contract. It is still unsigned. Q. Has any arrangement been made by anybody for an architect? A. No. A. (continuing) I have always said that I thought Mr. Leeper could handle that work. I used him on all my other matters."

Mr. Phelps testified that he never took up anything, either as a commissioner or as a board, with the Stoddard firm, and that he was always opposed to the employment of the Stoddard firm. His reason, apparently, was that King county had a competent engineering staff.

Sometime in December, 1942, a letter was written by Robert A. Morris, as clerk of the board, to the municipal league of Seattle, asking it to investigate the possibilities of an emergency appropriation to raise the two hundred thousand dollars. Accompanying it was a copy of a letter of December 4, 1942, from Mr. Smith to the board, stating that he had met with Mr. Durkee and Mr. Oldham of the Federal works agency, and had gone over with them the results of a conversation with Governor Langlie to the effect that there was no possibility of securing aid from the state without action of the legislature. Mr. Smith, in his letter to the

board, further stated that there seemed to be no alternative other than to make an emergency appropriation. Mr. Smith's recommendation was not followed, the other two members of the board refusing to make an emergency appropriation.

On April 28, 1943, plaintiff wrote a letter to Mr. Fluent. The following paragraphs of the letter were read into the record:

" 'An obligation to us has certainly been incurred, either by the County or the Federal Government, and the Federal Works Agency are willing to assume this obligation if the Board of County Commissioners will so advise them by letter, stating the amount ($6837) for architectural services rendered to date of rescindment of grant. We apparently are the innocent victims of circumstances in this case, which can be met by you writing such a letter.

" 'The only other means of liquidating our obligation is by direct payment by the county, or by making our obligation a part of the total fee—in the event the grant is reinstated—and our plans are used in the ultimate construction of the project.' "

Mr. Fluent testified that he had a meeting with R. L. Stoddard, apparently after receipt of the above-quoted letter, as follows:

"Q. What happened? A. And he told me that they had done work and that they were innocent victims. I told him, well, they went ahead on their own chances, apparently, without the Board's approval; or, if he said so, possibly he had done some work. And he indicated that if I would go ahead and approve his architectural work that they could even go ahead and get the grant reinstated and do the job. I told him it wasn't my—I had no right, I was only an individual member of the Board, that I had no right to hire an architect. And he then asked me if I would—it would be very easy, and it would save King county a lot of money, if we would just send a letter down and tell the Federal government we had received some valuable benefit from it. I told him that I couldn't in conscience send such a letter; that I would like to help him any way I could, but didn't feel that I could do that; that I considered the Federal government the same as I would county government, and that if they were liable they were and if they weren't they weren't, the same as the county. Q. What did you tell him with re-

spect to the plans that he talked about, that he said his firm had prepared? A. I told him they were of no value to us, we didn't want them, we had plans up there already that were sufficient for preliminary plans, and what was lacking in them Pete Leeper could supply."

On April 29, 1943, the Federal government exercised its rights reserved under the terms and conditions of the grant offer, and rescinded the grant allotment and abandoned the project.

On February 1, 1943, the minutes of the board show the following action taken:

"All action in securing addition to King county hospital previously carried on by former Chairman of Board, Tom Smith, was on motion rescinded."

The cause was tried by the court on June 5, 1944, and succeeding days, and, thereafter, findings of fact, conclusions of law, and judgment were entered in favor of defendant.

Appellant makes sixteen assignments of error. Based upon these assignments, appellant raises and discusses three principal questions in the following order: (1) Appellant was employed by King county. (2) No legal impediment existed to prevent King county from raising sponsor's share. (3) Enrichment of King county is not a necessary element in recovery.

Assignments 1 to 6, inclusive, and 13 to 16, inclusive, are included in the first question printed in appellant's brief. We shall discuss the first question:

In the first six assignments, it is claimed the court erred in making finding No. 6, in making finding No. 7, in stating in finding No. 7 (a) that the letter (dated February 26, 1942) of Tom Smith was delivered entirely on his own initiative, (b) that it was done by him solely as an individual member of the board of county commissioners, (c) and without the knowledge, consent, or approval of the other members of the board; in stating in finding No. 7 that the letter (of February 26, 1942) followed the longhand form prepared by R. L. Stoddard, in making and entering finding

No. 9, and in failing to find that the letter of February 26, 1942, was ratified by the board.

Assignment No. 13. The court erred in failing to find that plaintiff was employed by King county as an architect and engineer to perform the services sued for herein. (14) The court erred in denying plaintiff's motion for a new trial. (15) The court erred in failing to find for plaintiff in the sum of $6,837, together with interest at six per cent per annum from August 2, 1943, the date of rejection of his claim.

█ Appellant admits that, without a valid employment by the commission acting as a board, he is out of court. The burden was upon him to prove a valid employment by the board. He states that "employment of appellant is a question of fact"; that

"The resolutions of the board on May 29, November 10, and November 17, 1942, coupled with its knowledge that appellant was a professional man and was working for the county, are all that is needed to constitute that employment, unless the county prevails on its Fifth Affirmative Defense, substantially to the effect that the county 'because of statutory requirements and limitations upon its fiscal operations' was unable to raise its two hundred thousand dollars."

It is apparent, we think, that what appellant is relying upon to establish a contract of employment with the county, is the letter of February 26, 1942, written by Tom Smith to appellant, and the claimed subsequent ratification of the terms of that letter by the subsequent resolutions of the board passed on May 29, November 10, and November 17, 1942.

█ We are of the opinion that there is ample evidence to support the finding of the trial court that the letter of February 26, 1942, was written by Tom Smith, acting entirely upon his own initiative and solely as an individual member of the board, and without the knowledge, consent or approval of the other members of the board. We are also of the opinion that, when all the evidence is considered, the trial court did not err in failing to find that the letter was subsequently ratified by the board.

Rem. Rev. Stat., § 3984 [P. C. § 1470], provides:

"Powers—How exercised. Its powers can only be exercised by the county commissioners, or by agents or officers acting under their authority or authority of law."

Rem. Rev. Stat., § 4072 [P. C. § 1665], provides:

"Record of Proceedings. The board of county commissioners shall cause to be recorded, in a book to be kept for that purpose, all their proceedings and determinations touching all matters properly cognizable before them; and all books, accounts, vouchers, papers, and (accounts) touching the business or property of the county shall be carefully kept by the clerk, and open to the inspection of every person."

For a general statement as to who may act in behalf of a municipality, see 3 McQuillin Municipal Corporations (Rev. 2d ed.) 1131 *et seq.* In the same volume, at page 1309, we find the following statement:

"The ratification must be by the officer or body originally empowered to make the contract, and in the case of executory contracts in the mode and form required by law in the first instance, since ratification is equivalent to previous authorization and operates upon the act ratified in the same manner as though authority had been given originally."

We recognized and approved the principles last above announced in the case of *Hailey v. King County*, 21 Wn. (2d) 53, 149 P. (2d) 823, wherein we stated, p. 55:

"It is elementary, of course, that a contract, to be binding upon a municipal corporation, must be executed by the department, board, committee, council, officer, or agent vested by law with power to make it. . . . And the authority must be exercised by the proper authorities in their official capacity and in the manner provided by law. . . . Likewise, ratification of a contract may be effected only by the officer or body originally empowered to make it."

In the case of *Kelly v. Hamilton*, 76 Wash. 576, 136 Pac. 1148, in discussing the liability of the county commissioners of King county for certain acts of an architect employed by them, we stated, p. 583:

"It is argued by the respondent that the county commissioners were bound by the acts of this architect, and that, therefore, they were required to build the building pictured for the sum specified in the bond issue. But the board of county commissioners can act authoritatively only by resolution properly spread upon the minutes and joined in by a majority of the board. This it is conceded was never done. The commissioners were no more bound by the unauthorized acts of the architect than they were by speeches or statements of enthusiasts who were advocating or resisting the issuance of the bonds."

 The above quotation is applicable to the extent that it seems to recognize that our statutes contemplate that a board of county commissioners can act authoritatively only by resolutions properly spread upon the minutes and joined in by a majority of the board.

Appellant states, on page 26 of his brief:

"At times it is necessary for one commissioner to take the initiative and carry through a project until it is ready for final and conclusive action. That was done in this case."

 It may be that the statement last above set out is true and that one commissioner could so proceed if no attempt was made to obligate the county; but, before one commissioner can obligate the county, it must plainly appear that he was authorized to act for the board and that such authority was given at a legal meeting and concurred in by a majority of the board, or it must clearly appear that the acts of such commissioner were ratified by the board at a legal meeting.

In *Tukwila v. King County*, 99 Wash. 439, 169 Pac. 824, the question of the power of one commissioner to bind the county was discussed. In that case, the board of county commissioners by resolution had decided to condemn a right of way for a portion of what is known as the Seattle-Tacoma highway. The part of the right of way desired was on the streets of the town of Tukwila and across the property of intervener. The county right of way agent and M. L. Hamilton, one of the county commissioners, together with the deputy prosecuting attorney of King

county, represented to the mayor and city council of Tukwila and to the intervener that the highway would be paved with first-class brick. Relying, as they contended, upon these representations and the promise that the highway would be so constructed, the town, by ordinance, granted King county a right of way on its streets, and the intervener deeded a strip of land from her lots in Tukwila to the county without compensation. The county took possession of, and, at the time of the trial, had graded, the right of way. When it developed that the board intended to pave that portion of the highway with concrete and not brick, action was instituted to restrain the county from proceeding.

While there is a principle of law involved in the *Tukwila* case which is not in the instant case, we cite it because of the following statements relating to the power of one commissioner to bind the county. In referring to the acts of the right of way agent and the prosecuting attorney, the opinion states, p. 441:

"Their acts were all subject to approval or disapproval by the board of commissioners. The right of way agent's only authority for making such representations and promises is found in the oral instructions of Mr. Hamilton, the commissioner from the district in which the highway was to be constructed. . . .

"Appellants insist that it has been the custom for commissioners from the north and south districts to have exclusive control over the construction of the roads and highways in their respective districts, and suggest that there was an understanding by which they agreed in advance to vote in support of each other's recommendations. We do not so read the testimony. *But even if it were so, the county is entitled to have each commissioner exercise his own independent judgment on each matter that is presented to the board.*" (Italics ours.)

■ It is the general rule, and we have so announced, that, when dealing with an officer or officers of a municipal corporation, one must be presumed to have knowledge of the power and authority of such officer or officers, and that, when he deals with such officer or officers in a manner not

in compliance with the law, he does so at his peril. *Paul v. Seattle,* 40 Wash. 294, 82 Pac. 601.

In *State v. Levy,* 8 Wn. (2d) 630, 113 P. (2d) 306, we stated, p. 649:

"It will be noted that Rem. Rev. Stat. (Sup.), § 11294, quoted above, makes it the *duty of the board, as a body, and not of any individual member thereof,* to enter the order required by the statute; and that Rem. Rev. Stat., § 4072, also above quoted, similarly makes it the *duty of the board, as a body, and not of any individual member thereof,* to cause all their proceedings to be recorded in a book kept for that purpose. . . .

"Neither of those statutes *confers the right, or enjoins the duty, upon any individual member of the board to do the things required therein.*" (Italics ours.)

We conclude that Tom Smith had no authority from the board to write the letter of February 26, 1942, and, further, that the board never ratified, by subsequent resolution or resolutions, the purported employment of appellant as contained in such letter; for, if Mr. Fluent and Mr. Phelps are to be believed, and the trial court apparently accepted their testimony, Mr. Fluent never saw the letter until March, 1943, and Mr. Phelps never saw it until he came into court. Mr. Phelps and Mr. Fluent certainly could not ratify something which they did not know existed.

We are of the opinion, therefore, that appellant, as the basis for his right to recover herein, failed to prove a valid express contract of employment with King county for the services claimed.

■ Nor could appellant recover on the theory of an implied contract, regardless of whether or not it be considered necessary, in order to prevail under such theory, that there must be an unjust enrichment on the part of the municipality; for, in *Hailey v. King County,* 21 Wn. (2d) 53, 149 P. (2d) 823, after referring to the doctrine and the cases wherein this court had applied it, we stated, p. 57:

"No decision of this court has been called to our attention, however, which has invoked the doctrine of implied contract to fasten liability on a municipal corporation for purely personal services; indeed, the applicability of the

doctrine in such a case was effectually denied in *Chandler v. Washington Toll Bridge Authority,* 17 Wn. (2d) 591, 137 P. (2d) 97.

█ Assuming, however, for the purposes of this case, that appellant did establish a contract of employment with King county, according to the terms and conditions of the letter of February 26, 1942, written by Tom Smith to appellant, still, we are of the opinion that appellant cannot recover herein for the reason that the only obligation incurred by King county thereunder was based upon a contingency which never came to pass. It will be remembered that the letter concluded with the following paragraph:

"In the event no Federal grant is made available for this job and the job does not materialize, the Board of County Commissioners is in no way obligated to your firm."

The trial court specifically found, in finding of fact No. 16, that no Federal grant was ever made available for the project or "job" referred to in the letter; that the project or "job" did not materialize; that the authority purported to be conveyed by the letter never became operative or effective; and that the board and King county never became in any way obligated to the plaintiff under the express terms of the letter, or otherwise.

As we understand appellant's contention, in regard to the contingency claimed, it is to the effect that the failure of the project to materialize was due to a wrongful act of the board in failing to make the emergency appropriation which they legally could have made, and that the board cannot now take advantage of this wrongful act and make it the basis for the claim that the project did not materialize. Appellant then cites our cases dealing with the question of emergency appropriations.

It will be noticed that the letter of February 26, 1942, makes no mention of any money to be raised by King county. In fact, the evidence shows that Mr. Smith attempted to get a one hundred per cent grant from the government, and it was not until August, 1942, that King county was informed that it would have to raise two hun-

dred thousand dollars as a sponsor's share. When the grant offer was accepted by the board, subject to the conditions therein contained, it was undoubtedly the thought of the board that the two hundred thousand dollars to be raised by King county would be included in the budget, subject to ballot at the general election on November 3, 1942.

The proceeding above outlined was followed, and, as we have stated, the proposition of a one-mill levy to raise the two hundred thousand dollars was submitted to the voters, and it lost. Appellant contends that, regardless of the effect of the vote, the commission could and should have made an emergency appropriation to meet the sponsor's share of the project. It is true that Mr. Smith recommended that an emergency appropriation be made, but the other two members were unwilling to make such an appropriation.

Regardless of whether or not the board could legally have made such an appropriation, we are of the opinion that the appellant had no basis for his contention that the commissioners wrongfully refused to make such an appropriation. In other words, appellant cannot claim, under his purported contract, that the commissioners should have followed any particular procedure in an endeavor to raise the sponsor's share; and, when the commissioners submitted to the voters the proposition of raising that money, and the voters failed to authorize it, we think the board was justified in refusing thereafter to make an emergency appropriation, and that it cannot be said that the offer of the government was made unavailable because of the board's wrongdoing.

We therefore conclude that, under the terms of the purported contract itself and the facts herein, appellant is not entitled to recover for the services which he may have performed. It may be that there was not the co-operation between the commissioners in this instance that there might have been, and this may have resulted to the detriment of the appellant. This case indicates the difficulties that may arise when a person deals with one member of a board, regardless of his good faith. Such a person is presumed

to know that the law contemplates that the county is represented by the board as a body and can be obligated only by the board acting as a body; and, if he deals with one member of such body, he does so at his own risk.

For the reasons herein stated, the judgment of the trial court is affirmed.

BEALS, C. J., MILLARD, STEINERT, and GRADY, JJ., concur.

